## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| Kathleen Ronning-Schimetz, | Court File No. _____ |
| Plaintiff, | |
| v. | |
| North Dakota Office of the Adjutant General; Clark V. Johnson, *in his individual capacity*; and Stephen P. Herda, *in his individual capacity*, | **COMPLAINT (JURY TRIAL DEMANDED)** |
| Defendants. | |

Plaintiff Kathleen Ronning-Schimetz ("Ms. Schimetz"), through counsel, Nichols Kaster, PLLP, brings this action for damages and other legal and equitable relief resulting from violations of law by Defendants North Dakota Office of the Adjutant General ("OTAG"), Clark V. Johnson ("Mr. Johnson"), and Stephen P. Herda ("Mr. Herda"), collectively "Defendants," stating and alleging the following:

### <u>INTRODUCTION</u>

For nearly eight years, Ms. Schimetz was a civilian employee of OTAG. Throughout her employment Defendants and their subordinates subjected Ms. Schimetz to sexual harassment, ranging from calling her a "whore" to discussing with her graphic depictions of sex acts, and at least once instance of sexual assault. Simultaneously, Defendants and their subordinates ostracized and bullied Ms. Schimetz because of her political views and related speech. Ms. Schimetz regularly reported this conduct only to experience further retaliation and discrimination. Defendants failed to investigate her complaints and constructively terminated her employment.

1

Later investigations by both OTAG and the EEOC substantiated the facts underlying Ms. Schimetz's claims. Of particular note, the OTAG investigation concluded Ms. Schimetz "worked in a politically charged, abusive environment where unprofessionalism was common, tolerated and even led by Supervisors. Though she never filed a formal grievance, she asked for help multiple times and was let down over and over by her co-workers, her supervisor, her directorate, and her HR department." Having exhausted her administrative remedies, Ms. Schimetz now brings the instant action.

<b><u>PARTIES</u></b>

1.    Plaintiff Kathleen Ronning-Schimetz is an individual residing in Mandan, North Dakota.

2.    Defendant OTAG is an agency of the State of North Dakota overseeing the North Dakota Army National Guard, Air National Guard, Department of Emergency Services, and Civil Air Patrol which employs both state and federal employees. Defendant's principal place of business is located at North Dakota National Guard Joint Force Headquarters, Fraine Barracks, Bismarck, ND 58504.

3.    Defendant Clark V. Johnson is an individual who resides in Bismarck, North Dakota and is a current or former OTAG employee.

4.    Defendant Stephen P. Herda is an individual who resides in Mandan, North Dakota and is a current or former OTAG employee.

5.    At all relevant times, OTAG was Plaintiff's employer, and Plaintiff was its employee, under applicable laws.

6.    Mr. Johnson and Mr. Herda were, at all relevant times, individual persons acting under color of state law who may be sued in their individual capacities pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

7.      This Court has original subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

8.      This Court has personal jurisdiction over Plaintiff and Defendants because all reside in North Dakota.

9.      Venue is proper in the District of North Dakota because OTAG resides in this District, and, separately, most if not of all the events and omissions giving rise to the claims described herein occurred in this District. 28 U.S.C. § 1391(b)(2).

10.     Assignment to the Western Division is proper because most if not all of the events and omissions giving rise to the claims described herein occurred in the Western Division. Gen. R. 1.1.

## FACTUAL ALLEGATIONS

11.     Ms. Schimetz began working for Defendant on March 1, 2016 as a GIS Specialist III, a civilian employee of the State of North Dakota. Working for OTAG was an exciting next step in her career specializing in Geographic Information System technology.

12.     Her position was funded equally by two OTAG departments: Directorate of Facilities Engineering ("DFE") and the Environmental Department ("ENV").

13.     At all relevant times, Mr. Herda was the ENV Director.

14.     For unrelated bureaucratic reasons, Ms. Schimetz reported to the DFE Director and not the ENV Director. However, as a result of the funding, Mr. Herda exercised some influence over Ms. Schimetz's work.

15.     In 2016, Mr. Johnson, then Col. Johnson, was DFE Director. Upon his retirement in 2019 or 2020, Russell Wolf ("Mr. Wolf"), then Col. Wolf, became DFE Director. Mr. Johnson remained with DFE as a supervisor reporting to Mr. Wolf.

16.    For a short time, Ms. Schimetz reported directly to Mr. Wolf. However, he promptly reorganized DFE such that she reported to Mr. Johnson, who in turn reported to Mr. Wolf. This structure remained in place for the remainder of Ms. Schimetz's employment.

17.    Employees from ENV and DFE, including both Ms. Schimetz and the ENV Director, worked together in the basement of the North Dakota National Guard Joint Force Headquarters, hereinafter "Building 30."

18.    Due to the ENV Director's presence in the basement of Building 30 and certain of her job duties, Ms. Schimetz had frequent contact with him.

**Mr. Herda and Others Subject Ms. Schimetz to Sexual Harassment**

19.    At the start of her employment, Ms. Schimetz was one of only four women working in the basement of Building 30. By 2021, she was the only woman working in the basement of Building 30.

20.    The GIS Specialist III who preceded Ms. Schimetz was also a woman.

21.    Within the first nine months of her employment, Ms. Schimetz began to experience sexual harassment which continued throughout her tenure.

22.    This harassment came primarily from Mr. Herda and Paul Zent ("Mr. Zent"), Master Planner for DFE.

23.    Mr. Herda and Mr. Zent's harassment targeting Ms. Schimetz included, but was not limited to, the following:

- Mr. Herda frequently told Ms. Schimetz detailed, explicit descriptions of pornography and sex acts;

- Mr. Herda compared Ms. Schimetz to a sex worker on at least one occasion in August 2022;

4

- Mr. Herda called Ms. Schimetz a "whore;"

- Mr. Herda told Ms. Schimetz of his sexual attraction to her and his desire to have sex with other women coworkers;

- Mr. Herda frequently spent long periods of time in Ms. Schimetz's office discussing his sex life and related personal problems;

- on multiple occasions, Mr. Herda would click his tongue or groan flirtatiously at Ms. Schimetz and other women in Building 30;

- when Ms. Schimetz protested, Mr. Herda commented that since Ms. Schimetz served in the military, she should be able to handle his harassment;

- Mr. Zent gifted Ms. Schimetz a sexually explicit cartoon which indicated that men's friendships with women exist only for the sexual gratification of men, and told her he agreed with the message; and

- Mr. Zent sexually assaulted Ms. Schimetz.

24.    As a further example, at one point in 2018, Mr. Herda told Ms. Schimetz that because he found her, in his words, "aesthetically pleasing," she might "have a chance" to have sex with him.

25.    Mr. Herda commented on multiple occasions that Ms. Schimetz should wear a dress to work.

26.    On at least one occasion when she was wearing conservative business attire, Mr. Herda told Ms. Schimetz that her outfit made her look like a "whore."

27.    On another occasion in 2018, Mr. Herda followed Ms. Schimetz out of Building 30 when she took a smoke break, telling her that he wanted to watch as she put her cigarette in and out of her lips. Ms. Schimetz protested.

28.     On another occasion in August 2022, Mr. Herda told Ms. Schimetz he had seen someone recently who he believed looked identical to her. He then showed Ms. Schimetz a photo of a scantily clad woman, who in Ms. Schimetz's opinion appeared to be a sex worker, standing outside of a building smoking.

29.     When Ms. Schimetz would ask Mr. Herda to desist, he would pretend her request hurt him and engage in emotionally manipulative tactics.

30.     After one interaction which left Ms. Schimetz particularly distraught, Mr. Herda reported himself to then-DFE Director Mr. Johnson. On information and belief, Mr. Johnson did not investigate the report or elevate it to Human Resources ("HR").

**Mr. Herda, Mr. Zent, and Others Foster a Hostile Work Environment Based on Sex**

31.     In addition to Mr. Herda and Mr. Zent's conduct in conversations directly with Ms. Schimetz, they fostered a work environment where sexual topics were discussed loudly, consistently, and broadly among the men in the basement of Building 30.

32.     This conduct included, but was not limited to, the following:

- Mr. Zent and Mr. Herda encouraged others to view and comment on sexually explicit imagery on their work computers, specifically photos of a former employee's breast augmentation, viewed on at least one occasion by Mr. Johnson;

- Mr. Herda was known to comment that beautiful women should not be allowed in meetings because he found them too distracting;

- Mr. Herda and Mr. Zent, among others, displayed sexually suggestive posters throughout the workplace, including in their offices; and

- Mr. Herda, and others, used the words "cunt" and "whore" frequently.

33.    As a further example, one poster on display in or around Mr. Herda's office superimposed a female colleague's head over a cheerleader's body and included the words "dream girl."

34.    This poster was not the only one of this particular employee in the office.

35.    Mr. Herda described to Ms. Schimetz—including in graphic terms—his sexual and romantic attraction for this particular employee.

36.    Another poster, displayed in or near Mr. Herda's office, depicted fishermen reeling in naked women. Mr. Herda explained to Ms. Schimetz that it demonstrated a fishing technique he described as "casting with flies."

37.    On one of the many occasions Ms. Schimetz complained to Mr. Herda about his conduct, he described it as only teasing, telling her he was "casting with flies." His statement drew a direct connection between his conduct with Ms. Schimetz and the sexually explicit imagery on the poster.

38.    As a further example of the hostile environment, one day in 2017 Ms. Schimetz and the colleague displayed in the "dream girl" poster referenced in paragraph 33 both found condoms left on their desks.

**Mr. Herda, Mr. Zent, and Others Retaliate Against Ms. Schimetz Because of Her Free Speech**

39.    Partisan political conversations and commentary pervaded the basement of Building 30, including that of a violent or graphic nature. When it became clear to Defendants and their subordinates that Ms. Schimetz held different views and asked them to stop their commentary, they retaliated against her.

40.    While not solely responsible for this conduct, Mr. Herda and Mr. Zent both stoked the partisan rancor.

41.    This conduct included, but was not limited to, the following:

- Mr. Herda's loud, frequent refrain that, instead of working, he would prefer to "be out shooting" members of the opposite political party;

- Mr. Herda's alternate refrain that he needed to "stock up" on ammunition;

- Mr. Herda displayed bullets in his office and bragged that even though he had been reported to HR for doing so, he continued to display them;

- Mr. Herda's reference to the 2017 Women's March on Washington as the "cunt march;"

- coworkers' description of Ms. Schimetz as a "femi-nazi" and other politically motivated slurs;

- Mr. Herda's statement to Ms. Schimetz that because she was a member of a different political party he no longer liked her; and

- Mr. Herda's instruction to Ms. Schimetz to vote for a specific candidate for President of the United States.

42.    Defendants subjected Ms. Schimetz to loud, consistent, violent, and partisan political speech in the workplace.

43.    On multiple occasions, Ms. Schimetz requested that her coworkers and her superiors end all partisan political discussions. They did not. Instead, they retaliated against her.

44.    For example, one coworker would loudly discuss violent and racist political views in the basement of Building 30. The coworker's speech was replete with expletives, racist, xenophobic, misogynist, and partisan political commentary.

45.    When she could, Ms. Schimetz would protest such speech contemporaneously. At other times, she reported it to Mr. Johnson, Mr. Wolf, Mr. Herda, and HR.

46.     For example, during a 2019 work trip colleagues used political slurs to describe Ms. Schimetz and bullied her because she expressed opposition to a public figure her colleagues were discussing and apparently supported. With their remarks continuing, she pleaded with them to stop their political discussions. They teased her further and refused to do so.

47.     On an earlier occasion, in November 2016, Mr. Herda instructed Ms. Schimetz to vote in the upcoming U.S. presidential election for the candidate he preferred (the "Candidate").

48.     Ms. Schimetz objected to Mr. Herda's instruction.

49.     Mr. Herda and Mr. Zent both supported the Candidate.

50.     Mr. Herda told Ms. Schimetz shortly thereafter that he no longer liked her. When she asked why, he confirmed that it was because she did not support the Candidate.

51.     It thereafter became known that Ms. Schimetz did not share the same political beliefs as Mr. Herda, Mr. Zent, and the vast majority of employees who worked in the basement of Building 30.

52.     After Mr. Herda informed Ms. Schimetz he no longer liked her, she began to notice that she was omitted from meetings and emails on which she should have been included. This started a pattern which continued throughout her employment.

53.     Ms. Schimetz continuously reported her exclusion from meetings to Mr. Johnson, Mr. Wolf, and HR.

**Mr. Zent Sexually Assaults Ms. Schimetz, Witnessed by a Colleague; Mr. Herda Threatens Ms. Schimetz if She Reports the Assault**

54.     In November or December 2016, news outlets began reporting that audio and video recordings claimed to have captured the Candidate stating that he could "grab" women "by the pussy."

55.     A small group including Mr. Zent, Ms. Schimetz, and another colleague, Kolleen Koppinger, discussed these recordings while standing in Ms. Schimetz's office. Ms. Schimetz pulled the recordings up online because she had not heard them.

56.     Upon hearing the recordings, Ms. Schimetz expressed her disagreement with the Candidate's statements but noted that she was unsurprised he believed assaultive conduct was acceptable.

57.     Ms. Schimetz's comments apparently angered Mr. Zent, who supported the Candidate.

58.     Mr. Zent was standing above and behind Ms. Schimetz.

59.     Mr. Zent reached at Ms. Schimetz, pushed his arm between her body and office chair, and then proceeded to grab and squeeze her buttocks and genitals in an angry manner.

60.     Ms. Schimetz immediately fought back, hitting his hand away and verbally warning him to never touch her again.

61.     Ms. Schimetz believed that Mr. Zent wanted to show her that, like the Candidate, he too could "grab" women "by the pussy."

62.     Ms. Koppinger witnessed the sexual assault.

63.     Ms. Schimetz later sent Mr. Zent a text, warning him to never touch her again.

64.     Mr. Zent responded, apologizing for his behavior and promising to never touch her in a manner evocative of the Candidate; confirming the connection between his sexual assault and Ms. Schimetz's political speech.

65.     Ms. Schimetz disclosed the sexual assault to Mr. Herda. She asked him what would happen if she reported it to HR.

66.     Mr. Herda told Ms. Schimetz that if she reported the assault to HR she would become a "pariah."

67.     On information and belief, Mr. Herda never reported the assault of Ms. Schimetz to HR.

68.     Ms. Schimetz feared for her job and livelihood as a result of Mr. Herda's threat.

69.     It was well-known in Building 30 around this time that another woman, also a state employee, had raised claims of a hostile work environment (the "Prior Complainant"). She named Mr. Herda and Mr. Johnson, among others, in her complaints.

70.     Mr. Herda discussed the Prior Complainant's claims with Ms. Schimetz, dismissing them as baseless grievances and casting the Prior Complainant as jealous of Mr. Herda for giving more attention to other women in the office.

71.     Others in the basement freely criticized and demonized the Prior Complainant, who later separated from state employment under terms unknown to Ms. Schimetz.

72.     The series of events leading to the Prior Complainant's separation—and related discussion by Mr. Herda and others in Building 30—supported Mr. Herda's threat that Ms. Schimetz would become a "pariah" if she were to file a formal complaint.

73.     Mr. Herda's threat chilled Ms. Schimetz's speech and placed her in fear of pursuing formal routes to remedy the harassment she was experiencing.

**Ms. Schimetz Experiences Extreme Emotional Distress as a Result of Defendants' Conduct**

74.     Beginning in May 2021, Ms. Schimetz's emotional distress from Defendants' misconduct became so severe she sought civilian mental health counseling.

75.     Ms. Schimetz's healthcare provider diagnosed her with Posttraumatic Stress Disorder, Generalized Anxiety Disorder, and Major Depressive Disorder. The provider affirmatively attributed the diagnoses to Defendants' conduct.

**Ms. Schimetz Continuously Reports Defendants' Misconduct, which Simultaneously Continues Unabated**

76.     Throughout her employment, Ms. Schimetz continuously reported Defendants' misconduct and retaliation to no avail. The following paragraphs 76–124 include demonstrative examples of her reports but are not an exhaustive list, given her reports spanned many years.

77.     Ms. Schimetz reported inappropriate political and sexual comments within the first few months of her employment in 2016.

78.     Mr. Johnson later said he recalled Ms. Schimetz coming to him to report inappropriate behavior as early as 2017.

79.     In 2018, Ms. Schimetz asked Mr. Herda to stop discussing inappropriate topics with her. He refused and his pattern of spending hours in her office continued. He would discuss his gun collection, problems with his marriage and sex life, and his sexual attraction to women at OTAG.

80.     At a routine training event in either 2018 or 2019, Ms. Schimetz was taught by OTAG about strategies for conflict resolution in the workplace. This training informed her that if one-on-one conflict resolution failed, a useful next step is mediation with a third party.

81.     In 2019, Ms. Schimetz made her first report directly to HR. She requested that either her office be moved out of the basement or that OTAG facilitate mediation between her and Mr. Herda to address his ongoing behavior in a professional manner.

82.     Ms. Schimetz found the OTAG HR representative, Cindy Pazdernik ("Ms. Pazdernik") to be condescending and dismissive of her complaints.

83.     Ms. Pazdernik informed Ms. Schimetz that she could not do anything to help if Ms. Schimetz did not want to file a formal grievance.

84.    Ms. Pazdernik's claim that she could not act unless Ms. Schimetz filed a formal complaint was an inaccurate statement of OTAG's then-current employment policies.

85.    Then-current policies required managers to report any harassing conduct they observe or that is reported to them, regardless of the mechanism by which they learned of such conduct.

86.    Ms. Schimetz was afraid of naming specific individuals and pursuing a formal charge because of the retaliation she witnessed against the Prior Complainant.

87.    Also in 2019, at a meeting with colleagues including Mr. Wolf, Ms. Schimetz asked for the political rhetoric in the office to stop.

88.    In 2019, Ms. Schimetz also reported the hostile environment to Mr. Johnson.

89.    Mr. Johnson indicated that if she was dissatisfied with her work environment, she could seek employment elsewhere.

90.    In 2020, Ms. Schimetz again reported the hostile environment to Ms. Pazdernik and again requested mediation or other conflict resolution assistance.

91.    Ms. Pazdernik again declined to investigate.

92.    In her 2020 performance evaluation, Ms. Schimetz documented the hostile environment she was experiencing and explained her efforts to remedy derogatory and inappropriate conduct.

93.    In 2021, Ms. Schimetz again reported the hostile environment to Mr. Johnson.

94.    Mr. Johnson again declined to meaningfully intervene.

95.    In 2021, Ms. Schimetz reported to Ms. Pazdernik that she was excluded from an ENV trip, budget meetings, and Ms. Koppinger's retirement party.

96.    Ms. Pazdernik laughed at Ms. Schimetz for claiming the exclusion was retaliatory.

97.     Ms. Pazdernik repeated the misstatement that she could only intervene if Ms. Schimetz were to file a formal grievance.

98.     Also in 2021, Mr. Herda's pattern of sexual discussions in Ms. Schimetz's office continued. He refused to desist, even after Ms. Schimetz told him that his describing his sexual desires for her coworkers made her sick.

99.     In 2021, Ms. Schimetz reported her exclusion to Mr. Wolf; Mr. Herda apparently complained to Mr. Wolf that Ms. Schimetz had reported him. With no resolution, Ms. Schimetz again reported to Ms. Pazdernik. Nothing changed.

100.    In late 2021, Ms. Schimetz spoke with Mr. Herda, who claimed he was trying to improve his conduct. Ms. Schimetz asked him directly if he was treating her differently because she had different political beliefs than him. Mr. Herda responded in the affirmative.

101.    Around the same time, Ms. Schimetz reported the hostile environment to Mr. Wolf again, including specific descriptions of the use of "cunt," "whore," and statements regarding shooting political opponents.

102.    Mr. Wolf later told Ms. Schimetz that as a result of this report he spoke with Mr. Herda and his team, instructing them to keep political and sexual comments to themselves.

103.    Mr. Herda, Mr. Zent, and others did not heed Mr. Wolf's directive.

104.    In or around February 2022, Ms. Schimetz reported her continued exclusion from budget and other meetings to Mr. Johnson.

105.    In or around March 2022, Mr. Herda again excluded Ms. Schimetz from a budget meeting. Ms. Schimetz confronted Mr. Herda. He claimed it was a mistake, and then proceeded to report Ms. Schimetz to Mr. Wolf, classifying her confrontation as inappropriate behavior.

106.    Mr. Wolf instructed Mr. Herda to include Ms. Schimetz in all ENV activities and communications.

107.    Thereafter, Mr. Herda chose to invite Ms. Schimetz to some unnecessary meetings but continued to exclude her from meetings central to her job duties.

108.    Due to the continued hostility in the basement of Building 30, and with no other remedial action taken by Defendants, Ms. Schimetz again asked to move to a different office upstairs in an attempt to mitigate the harassment and retaliation she was experiencing.

109.    Defendants granted Ms. Schimetz's request, and she moved upstairs to an old storage space near Ms. Pazdernik's office.

110.    Ms. Pazdernik later acknowledged she knew Ms. Schimetz moved offices, but claimed to not know why despite being repeatedly informed of Ms. Schimetz's complaints.

111.    At this time, a colleague informed Ms. Schimetz that following her move out of the basement, Mr. Herda instructed ENV employees not to speak with Ms. Schimetz.

112.    Also around this time, Mr. Wolf held a meeting in the basement of Building 30 to discuss inclusion in the workplace generally.

113.    While Mr. Wolf did not mention Ms. Schimetz, her colleagues understood the meeting to be a result of her complaints. Afterwards, a coworker told her that ENV colleagues complained to each other about her in relation to the meeting, commenting that he now understood why she had been excluded from ENV events.

114.    Ms. Schimetz continued to report Defendants' retaliatory conduct throughout 2022, including in emails to Ms. Pazdernik and Mr. Johnson.

115.    In early 2023, Ms. Schimetz again reported to Mr. Johnson that she was being excluded from meetings.

116.    Mr. Johnson dismissed her concerns.

117.    In later interviews, Mr. Wolf reported that each time Ms. Schimetz made a report to him, he involved Ms. Pazdernik in his response.

118.    Mr. Johnson later said he recalled that Ms. Schimetz reported misconduct to him at least 8–10 times over the course of her employment.

119.    After years of reporting Defendants' misconduct to no avail, Ms. Schimetz resigned her employment with OTAG in a letter dated January 10, 2023.

120.    In her letter, she explained that her resignation was the result of Defendants' severe and pervasive discrimination and retaliation:

> My time here has unfortunately been marked with continued hostility and exclusion from the very first month. I have been subjected to harassment under the guise of being "picked on", "teased" because I did not "belong". I was subjected to further exclusion after I stood up for myself and asked the team to try to treat me as a respected colleague.

121.    Later that day, Ms. Schimetz received a phone call at her home from Brigadier General Jackie Huber, Deputy Commander to the Adjutant General, and Judge Advocate General Michelle Hagel.

122.    Brig. Gen. Huber informed Ms. Schimetz that OTAG wished to investigate her complaints.

123.    Ms. Schimetz shared a brief history of the harassment, discrimination, and retaliation she experienced.

124.    Ms. Schimetz asked if the investigation meant she should retain legal counsel. JAG Hagel told her no at least three times.

**OTAG Investigates, Substantiates Ms. Schimetz's Allegations**

125.     On January 11, 2023, Brig. Gen. Huber appointed 2LT, QM Erin N. Demoe ("I/O Demoe") to investigate the work environment at Building 30 pursuant to Army Regulation 15–6.

126.     Within a matter of days, I/O Demoe conducted interviews with twelve witnesses to the harassment Ms. Schimetz experienced.

127.     Witnesses admitted or otherwise substantiated many key facts supporting the allegations contained within this Complaint.

128.     Shortly thereafter, on January 25, 2023, I/O Demoe formalized the conclusions of her investigation in a memorandum which made Findings and Recommendations supported by the preponderance of the evidence as required by Army Regulation 15–6.

129.     I/O Demoe found that Defendant subjected Ms. Schimetz to "harassment, sexual harassment, ostracism, retaliation, and inappropriate behavior in the workplace."

130.     I/O Demoe found that Mr. Zent perpetrated a sexual assault against Ms. Schimetz because, *inter alia*, Mr. Zent admitted in his interview with I/O Demoe that physical contact took place, Ms. Koppinger witnessed the assault and confirmed Ms. Schimetz's version of events, two other coworkers Ms. Schimetz informed contemporaneously also confirmed her version of events, and Mr. Herda's account also supported Ms. Schimetz's view.

131.     I/O Demoe specifically found that Mr. Herda, Mr. Johnson, Mr. Wolf, and Ms. Pazdernik knew of the misconduct in Ms. Schimetz's workplace yet failed to act.

132.     I/O Demoe found that the misconduct included intimidating and hostile work conditions from verbal and non-verbal harassment on the basis of both sex and political affiliation.

133.     I/O Demoe noted "[t]hese incidents occurred over the span of more than 6 years, are extremely egregious, in direct conflict with the Workplace Anti-harassment policy, as well as the Army Values."

**The EEOC Investigates, Substantiates Ms. Schimetz's Allegations**

134.    Ms. Schimetz filed her charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), Equal Pay Act of 1963, and North Dakota Human Rights Act on February 7, 2023.

135.    Her charge was cross-filed with the North Dakota Deportment of Labor and Human Rights ("ND DOLHR")

136.    The EEOC conducted interviews with eight witnesses, several of whom were also interviewed by I/O Demoe.

137.    On August 14, 2024, the EEOC, like I/O Demoe, also determined that Ms. Schimetz was sexually harassed, that OTAG failed to investigate Ms. Schimetz's complaints, and that the sexual harassment constructively terminated her employment.

138.    After conciliation failed, Ms. Schimetz received her EEOC Notice of Right to Sue on November 15, 2024.

139.    On January 24, 2025, ND DOLHR adopted the EEOC's findings consistent with its work-sharing agreement with the EEOC and issued Ms. Schimetz a Right to Sue notice under state law.

140.    Ms. Schimetz brings this action within 90 days of her EEOC Notice of Right to Sue.

## <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>

**Hostile Work Environment Sex Discrimination in Violation of**
**Title VII of the Civil Rights Act**
**42 U.S.C. § 2000e, *et seq.***
*Defendant OTAG*

141.    Plaintiff incorporates the foregoing paragraphs by reference.

142.     Plaintiff and Defendant OTAG are "employee" and "employer" respectively for purposes of the definition set forth in 42 U.S.C. § 2000e, *et seq.*

143.     Title VII, 42 U.S.C. § 2000e-2(a)(1), provides that it is "an unlawful employment practice for an employer to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."

144.     Defendant OTAG's conduct described herein constitutes sex discrimination in violation of Title VII. The unwelcome conduct, including sexual assault, that Plaintiff was subjected to was based on her sex, substantially interfered with her employment, and created an intimidating, hostile, and offensive work environment. This conduct was sexual harassment in direct violation of 42 U.S.C. § 2000e, *et seq.* The harassment was severe and pervasive such that it substantially affected and interfered with Plaintiff's employment. Defendant OTAG knew or should have known of the existence of the harassment and failed to take timely and appropriate corrective action.

145.     As a result of Defendant OTAG's unlawful actions and the failure to properly address the unlawful conduct, Plaintiff has suffered and continues to suffer past and present loss of income, lost benefits, out-of-pocket damages, mental anguish, emotional distress, physical manifestations of emotional distress, humiliation, embarrassment, loss of reputation, and other pain and suffering in an amount in excess of $75,000. Plaintiff is entitled to full relief under Title VII. Plaintiff is also entitled to attorneys' fees and costs incurred in connection with this claim.

146.     Because Defendant OTAG committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

## COUNT II

### Retaliation in Violation of Title VII
### 42 U.S.C. § 2000e, *et seq.*
*Defendant OTAG*

147.    Plaintiff incorporates the foregoing paragraphs by reference.

148.    Plaintiff and Defendant OTAG are "employee" and "employer" respectively for purposes of the definition set forth in 42 U.S.C. § 2000e, *et seq.*

149.    Title VII, 42 U.S.C. § 200e-3(a), provides that it is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [that employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ."

150.    Defendant OTAG's conduct described herein constitutes retaliation in violation of Title VII. Plaintiff continuously opposed sexual harassment and assault throughout the course of her employment. Rather than take remedial action, Defendant OTAG laughed at her, excluded her from meetings, subjected her to additional discrimination and harassment because of her opposition, and created an intimidating, hostile, and offensive work environment. This conduct was retaliation in direct violation of 42 U.S.C. § 2000e, *et seq.* Defendant OTAG knew or should have known of the retaliation and failed to take timely and appropriate corrective action.

151.    As a result of Defendant OTAG's unlawful actions and the failure to properly address the unlawful conduct, Plaintiff has suffered and continues to suffer past and present loss of income, lost benefits, out-of-pocket damages, mental anguish, emotional distress, physical manifestations of emotional distress, humiliation, embarrassment, loss of reputation, and other pain and suffering in an amount in excess of $75,000. Plaintiff is entitled to full relief under Title VII. Plaintiff is also entitled to attorneys' fees and costs incurred in connection with this claim.

152.    Because Defendant OTAG committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

## COUNT III

### Retaliation in Violation of the U.S. Constitution
### 42 U.S.C. § 1983
*Defendants Mr. Johnson and Mr. Herda*

153.    Plaintiff incorporates the foregoing paragraphs by reference.

154.    The First and Fourteenth Amendments to the U.S. Constitution prohibit retaliation against public employees because they speak on matters of public concern. This includes expressing political viewpoints in the workplace and being known to hold, or perceived to hold, certain political viewpoints.

155.    Plaintiff, Defendant Mr. Johnson, and Defendant Mr. Herda are "persons" within the meaning of 42 U.S.C. § 1983.

156.    Plaintiff spoke on matters of public concern when she opposed partisan political conversations and related violent statements, when she spoke in opposition to public figures and politicians supported by some if not all of her coworkers, when she refused Mr. Herda's directive to vote for a specific candidate for President of the United States, and when she engaged in other speech opposing political statements espoused by others in the workplace.

157.    Because of Plaintiff's speech, Defendants Mr. Johnson and Mr. Herda, individually and collectively, took adverse employment actions against Plaintiff that deprived her of her constitutionally protected rights to free speech, expression, and association.

158.    In taking these actions, Defendants Mr. Johnson and Mr. Herda acted under color of state law.

159.    As described herein, Defendants Mr. Johnson and Mr. Herda engaged in unlawful retaliation against Plaintiff under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

160.    Plaintiff is entitled to any and all relief available under Section 1983, including economic damages, compensatory damages, attorneys' fees, costs, disbursements, and other equitable relief.

161.    Because Defendants Mr. Johnson and Mr. Herda, acting under color of law, directly participated in the foregoing acts and intentionally committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

162.    As a result of Defendants Mr. Johnson and Mr. Herda's unlawful conduct, Plaintiff has suffered economic losses (including lost wages and/or benefits, and other damages), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

### COUNT IV

**Sex Discrimination in Violation of the U.S. Constitution**
**42 U.S.C. § 1983**
*Defendants Mr. Johnson and Mr. Herda*

163.    Plaintiff incorporates the foregoing paragraphs by reference.

164.    The Fourteenth Amendment to the U.S. Constitution prohibits discrimination against a public employe based on sex.

165.    Plaintiff, Defendant Mr. Johnson, and Defendant Mr. Herda are "persons" within the meaning of 42 U.S.C. § 1983.

166.    Plaintiff is a woman.

167.    Defendants Mr. Johnson and Mr. Herda, individually and collectively, treated Ms. Schimetz differently because of her sex and ultimately constructively terminated her because of her sex.

168.    In taking these actions, Defendants Mr. Johnson and Mr. Herda acted under color of state law.

169.    As described herein, Defendants Mr. Johnson and Mr. Herda engaged in unlawful retaliation against Plaintiff under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

170.    Plaintiff is entitled to any and all relief available under Section 1983, including economic damages, compensatory damages, attorneys' fees, costs, disbursements, and other equitable relief.

171.    Because Defendants Mr. Johnson and Mr. Herda, acting under color of law, directly participated in the foregoing acts and intentionally committed the foregoing acts with malice or reckless indifference to Plaintiff's federally protected rights, she is also entitled to punitive damages.

172.    As a result of Defendants Mr. Johnson and Mr. Herda's unlawful conduct, Plaintiff has suffered economic losses (including lost wages and/or benefits, and other damages), emotional distress, humiliation and embarrassment, harm to her dignity, loss of reputation, lost earning capacity, and other injuries.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff Kathleen Ronning-Schimetz hereby requests trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Kathleen Ronning-Schimetz requests that the Court issue judgment against Defendants as follows:

A.    Judgment against Defendant that the conduct complained of herein be determined and adjudged to constitute violations of the United States Constitution, 42 U.S.C. § 1983, and Title VII;

B. All relief recoverable under 42 U.S.C. § 1983 and Title VII, including, but not limited to, back pay, front pay, compensatory damages for future pecuniary loss, emotional distress, physical manifestations of emotional distress, humiliation, mental anguish, inconvenience, civil penalties, and interest, all in an amount in excess of $75,000;

C. Award punitive damages against Defendants Mr. Johnson and Mr. Herda for their violation of Plaintiff's federally protected rights in an amount to be determined by a jury;

D. All of Plaintiff's attorneys' fees and costs incurred in bringing this action;

E. A jury trial on all issues;

F. All such other and further relief available by statute; and

G. All such other and further relief the Court deems just and equitable.


NICHOLS KASTER, PLLP

Date: February 4, 2025

Steven Andrew Smith (MN# 260836)
    smith@nka.com
Riley Palmer (MN #0504224)
    rpalmer@nka.com
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 338-4878

**ATTORNEYS FOR PLAINTIFF**