**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Kathleen Ronning-Schimetz,<br><br>Plaintiff,<br><br>v.<br><br>North Dakota Office of the Adjutant General, and Stephen P. Herda, in his individual capacity,<br><br>Defendants. | **MEMORANDUM IN SUPPORT OF MOTION TO AMEND SCHEDULING ORDER AND MOTION TO COMPEL**<br><br>**Case No. 1:25-cv-00023** |

Three months ago, this discovery dispute appeared nothing more than a simple oversight which would easily be corrected by a letter to counsel. The matter has subsequently ballooned into a monthslong odyssey in which State Defendants have struggled to piece together even the most basic information to which they are legally entitled. Plaintiff has resisted at every turn, but her refusals to answer even simple questions have revealed the foundational flaws in her discovery process, which have slowly become apparent from the deficiencies implicit from the face of her discovery responses and her counsel's explicit rejection of any reasonable interpretation of the duty to supplement. Despite these barriers, within the last ten days, State Defendants have finally received objective proof of Plaintiff's noncompliance with her Rule 26 obligations – not from Plaintiff herself, but from the production of documents from another witness. However, State Defendants are still in the dark as to the extent of Plaintiff's noncompliance, and how it impacts their ability to defend themselves against the claims Plaintiff has brought. While State Defendants have worked diligently to reverse engineer the information to which they are legally entitled, they can only go so far without Court intervention.

While discovery has closed and the deadline to file discovery motions has passed, State Defendants respectfully submit that the circumstances here constitute good cause to entertain this motion now. As detailed below, State Defendants reasonably relied on the protections of Fed. R. Civ. P. Rule 26(g) when Plaintiff made her earlier responses; they had no way of knowing that

many of those responses were flatly wrong, nor did they receive external proof that her discovery production was incomplete until last week. State Defendants respectfully request that this Court grant the relief requested here, or whatever other relief the Court would order to ensure the "just, speedy, and inexpensive" determination of this dispute. Fed. R. Civ. P. 1.

## BACKGROUND

Due to Plaintiff's production of incomplete and contradictory information, State Defendants only gradually realized the concerns with Plaintiff's discovery compliance. The background of this matter is difficult to summarize, but is set forth efficiently as possible below.

### I. Underlying Case.

In this case, Plaintiff alleges that she was the victim of a hostile work environment during her employment at the Defendant North Dakota Office of Adjutant General ("OTAG"), where she worked from March 2016 to January 2023. *See generally* Doc. No. 1. In particular, she alleges that she was the object of sexual harassment by her former coworker, State Defendant Steve Herda, and another former coworker by the name of Paul Zent (not named in the Complaint).

Plaintiff's Complaint contains many allegations of sexual harassment during her time at OTAG. Relevant here, she alleges that she was a victim of sexual assault by Paul Zent in November or December 2016. After detailing the assault, Doc. No. 1 at ¶¶ 54-64, she states:

> ¶ 63. Ms. Schimetz later **sent Mr. Zent a text**, warning him to never touch her again.
>
> ¶ 64. Mr. Zent **responded**, apologizing for his behavior and promising to never touch her in a manner evocative of the Candidate; confirming the connection between his sexual assault and Ms. Schimetz's political speech.

Doc. No. 1 at ¶¶ 63-64.

Notably, Zent is not a party to this matter. Again, Plaintiff worked at OTAG from 2016 until 2023. Only *after* she resigned in January 2023 did she reveal the alleged sexual assault from seven years before. Less than two months later, Zent was terminated by OTAG.

### II. Opening Interrogatories.

When discovery commenced, Plaintiff served interrogatories on OTAG and Herda seeking

detailed information about sources of responsive ESI in their custody and control, including cell phones and cloud storage. State Defendants responded fully without objection. For instance, Herda explained that he had a Samsung S24 Android Cell phone which he had possessed for approximately two years, which contained text messages dating back to approximately December 2019. *See* Ex. F, Herda Response Excerpt, Interrogatories 4 and 6.

Subsequently, State Defendants served similar interrogatories on Plaintiff:

> **INTERROGATORY NO. 2:** Identify each mobile phone which You have used from **January 1, 2016, to present**, including service provider, phone number, and whether You still have access to the contents of that phone.
>
> **INTERROGATORY NO. 3:** Identify how far back Your text messages go on Your current phone. If you use other messaging apps besides Your phone's inherent text messaging system, such as Signal or WhatsApp, so state and identify how far back those text messages go.
>
> . . .
>
> **INTERROGATORY NO. 6**: Describe the steps You have taken to preserve Documents, ESI, devices, and accounts relevant to this Action, including the date You first implemented preservation, scope of preservation, **any deletions or losses**, and any restoration efforts.

Ex. A, Interrogatory Response Excerpt, at 2-8, 11-12 (emphasis added); *see also* Ex. B., Device List Comparison Chart.[1]

Since these interrogatories were similar to those Plaintiff served on State Defendants, they expected a similarly candid response. But to their surprise, Plaintiff largely refused to answer. Instead, Plaintiff objected on grounds such as attorney-client privilege, work product, and improper "discovery on discovery." Perhaps unusually for a represented party, Plaintiff also objected to certain interrogatories "to the extent it requests that she form legal conclusions about her discovery obligations under the Federal Rules of Civil Procedure that she is not qualified to make." Somewhat implausibly, Plaintiff also claimed an inability to understand the phrases

[1] State Defendants created this chart to aid their own understanding in this matter. It is based on Plaintiff's interrogatory responses, but contains information in streamlined form and focuses on devices from the period when responsive data is missing (*i.e.*, from 2016 until April 2021).

"access to the contents of the device" and "how far those text messages go." Plaintiff *did*, however, set forth a list of devices she used since 2016. Her initial device list is as follows:

1. Motorola G 2022, phone number (701) 425-1487, approximately 2023-present;
2. Motorola with Stylus, phone number (701) 425-1487, apprx. 2019-2023;
3. **Samsung Jitterbug, phone number (701) 391-8049, approximately 2016-2018;**
4. Tracfone, unknown phone number, approximately 2015-2016.

Ex. A, Interrogatory Response Excerpt, at 3 (emphasis added); *see also* Ex. B., Device List Comparison Chart.

Importantly, however, Plaintiff refused to disclose whether she still had access to the contents of any of these four phones.

## III. State Defendants First Learn That Plaintiff's Production Is Incomplete.

As the case proceeded, it became clear that the vast majority of the sexually harassing behavior alleged by Plaintiff occurred between 2016 and 2020 (*i.e.*, during the first four or so years of her roughly seven-year employment). Yet the earliest text message produced in this matter was from April of 2021, although Facebook messages were produced from earlier years. The asymmetry between Plaintiff's allegations (pre-2020) and the bulk of the evidence produced (post-2021) was perhaps unusual, but didn't necessarily raise a red flag. After all, State Defendants were mindful of the requirements of Fed. R. Civ. P. Rule 26(g), and had no reason to suspect that Plaintiff wasn't providing complete and correct information.

This changed at Plaintiff's deposition on July 27, 2026, when she was directly asked about the text messages she exchanged with Zent on the day of the alleged assault.

**Question:** Do you still have the text message where you texted Mr. Zent that same day?

**Answer**: I believe it – that was on an older phone of mine, like a Tracphone, just one – I hadn't – didn't have a smart phone at that time.

**Question**: Was it on a Tracphone or a Jitterbug?

**Answer**: I don't know. But it was – it was something like that, you know, like a monthly plan and a cheap phone and a –

**Question**: **So not a smart phone?**

**Answer:** No.

**Question**: And so fair to say the messages from that old phone are not, like, preloaded onto your current smart phone?
**Answer**: No, they're not.
**Question**: Okay. Do you still physically have the phone?
**Answer**: I believe I do.
**Question**: Okay. And where would that be located?
**Answer**: In my office in my house.

Ex. G, Schimetz Dep., 114:16-20. Notably, this answer neatly tracked with Plaintiff's device history at the time, which listed a "Samsung Jitterbug" in use from approximately 2016-2018. *See* Ex. A. at 3; Ex. B.State Defendants were surprised to hear the above testimony from Plaintiff regarding her possession of the non-smartphone, because again, no text messages prior to April 2021 had been produced. Nonetheless, they presumed this was a mere oversight which would quickly be remedied after a letter to opposing counsel. This presumption turned out to be incorrect.

Another discovery concern arose from the deposition of Mary Boardman, Plaintiff's friend and former co-worker at OTAG. At Boardman's deposition, which occurred the month after Plaintiff's, Boardman was asked whether she had any written messages exchanged with Plaintiff. *See* Ex. H., Boardman Depo Excerpt at 86:6-8. Boardman testified in the affirmative, picked up her phone, and actually began reading aloud Facebook messages to and from Plaintiff into the record. *Id.* at 86-87. Further, Boardman testified to a message exchanged with Plaintiff about the deposition itself, which State Defendants were unaware of. *Id.* at 92:8-12. On the record, undersigned counsel received assurances from Boardman that she would take screenshots of all their communications and provide them within seven days. 87:22-23. State Defendants presumed these messages would be quickly forthcoming. This presumption, too, was incorrect.

## IV. State Defendants Attempt to Piece Together What Happened to the Non-Smartphone.

What State Defendants assumed would be a simple matter of getting supplemental documents has turned into a quagmire. A timeline is required to most coherently summarize.

**August 21, 2026:** On this date, after the Boardman deposition, undersigned counsel wrote to Plaintiffs' counsel pointing out Plaintiff's testimony regarding the non-smartphone and

requesting responsive messages from the phone. Counsel also requested full answers to Interrogatories cited above, since Plaintiff's testimony indicated older messages were available that had not been searched. *See* Ex C, Correspondence,[2] at 35-36.

**September 10, 2026**: Plaintiff's counsel responds to State Defendants' August 21 letter, refusing to provide the missing information in the three interrogatories. Citing the existence of the Jitterbug and Tracphone, Plaintiff's counsel wrote:

> You then asked about both of those devices at her deposition, and she could not recall specifically which device she used at the time of the texts in question. **On further review, she believes the Jitterbug device was in use from approximately 2014 through July 2016**. She thereafter used a pre-paid Tracfone for a period of time, which she assumes to have begun when she stopped using the Jitterbug in or around July 2016. After an exhaustive search, **she has been unable to locate the Tracfone or any other devices not previously searched.**[3] She will serve corresponding supplemented interrogatory responses shortly.

Ex. C, Correspondence, at 33. In supplemental discovery responses served that same day, Plaintiff set forth a new list of devices. Most pertinent here, these included:

> 3. Motorola G Stylus 5G, (701) 425-1487, approximately Oct. 2021 – Aug. 2022;
>
> 4. Samsung Galaxy A0l, (701) 425-1487, approximately Nov. 2020–Oct. 2021;
>
> 5. Unknown device(s), approximately July 2016–Nov. 2020;
>
> 6. Samsung Jitterbug, (701) 319-8049, approximately 2014–July 2016.

Ex. A at 3-4.

Three changes are striking when this list is compared with Plaintiff's earlier list. *See* Ex.

---

[2] Because some of the earlier letters also address a supplementation issue with medical records, State Defendants redact those limited portions since they are not at issue in the instant dispute. However, State Defendants will certainly file an unredacted version if the Court so prefers.

[3] State Defendants understood the representation that Plaintiff was "unable to locate the Tracfone or any other devices not previously searched" to mean that Plaintiff was unable to locate *any* non-smartphone, including the non-smartphone containing the messages with Paul Zent. But as detailed below, Plaintiff's counsel eventually shared that the Jitterbug had been located by the Plaintiff and "searched" *before her deposition ever took place*. State Defendants, of course, had no way of knowing the Jitterbug was found, let alone searched, and so were unable to perceive that the phrase "any other devices not previously search" excluded the Jitterbug.

B, Device List Comparison Chart. First, Plaintiff changed the dates that the Jitterbug was used from 2016–2018 (the timeframe during which the alleged assault occurred) to 2014–July 2016 (a timeframe before the alleged assault occurred). Second, Plaintiff introduced for the first time a *Samsung* smart phone (the Galaxy A01). This device, along with the "unknown device(s)", displaces the previously-disclosed Motorola smartphone during the years of 2019-2021.

Third, and most strikingly, Plaintiff now claims that during the *entire period* of July 2016 through November 2020 – *i.e.*, the major part of her employment with OTAG when the bulk of the harassing conduct allegedly occurred – she was using an "unknown device" with an apparently unknown phone number.

**September 10, 2026–October 15, 2026**: During this period of ongoing dispute, undersigned counsel continued to seek a straight answer as to what happened to the non-smartphone and to receive full responses to Interrogatories 2, 3, and 6. Yet despite sincere efforts, Plaintiff still refused to answer whether she had access to the contents of any of the disclosed phones, nor would she answer State Defendants' other outstanding interrogatories. *See generally* Ex. C, Correspondence, at 21-33.

Also during this period, State Defendants informed Plaintiff's counsel of another discovery deficiency that had arisen regarding Plaintiff's friend Mary Boardman. Boardman had agreed during her deposition to produce screenshots of messages between herself and Plaintiff, including at least one message regarding the deposition itself. Yet for some reason, she failed to do so. State Defendants accordingly requested these messages from Plaintiff. Correspondence at 32-33. Plaintiff's counsel responded:

> Plaintiff previously produced responsive text messages exchanged with Ms. Boardman. **Your letter seems to seek information that allegedly came into existence during the discovery period and after Plaintiff's phone data were collected.** Producing data generated since then would require Plaintiff to repeat the costly and time-consuming process of collecting data from her phone, which is unreasonable at this stage. Any such data could have no relevance to the forthcoming summary judgment motions, would needlessly drive up costs, and would itself create further unnecessary delay. Plaintiff does not dispute that a phone may need to be collected again under some circumstances, such as after a **particularly long pre-trial delay**. **But Plaintiff's duty to supplement does not require her to continuously produce cell phone data to Defendant as it comes into**

> **existence.** She need not, and will not, expend time and resources needlessly collecting irrelevant data at this stage.

Ex. C at 28 (emphasis added). State Defendants were surprised by this letter and responded that Rule 26(e) absolutely *does* require Plaintiff to produce any newly-generated responsive and relevant messages. *Id.* at 24. Plaintiff responded by agreeing to provide screenshots of only the specific message testified to by Boardman regarding the deposition, and continued to assert that she was not obligated to formally collect and re-review responsive data from her phone. *Id.* at 22. During a later meet and confer, Plaintiff's counsel also rejected the possibility of supplementation without a formal collection, because a non-attorney such as Plaintiff would be unable to discern which information was responsive.

During this same period, Plaintiff's counsel made several representations regarding her efforts to recover data from the "missing" period between July 2016 and November 2020. Specifically, Plaintiff's counsel wrote:

> As you know from Plaintiff's discovery responses, other than the Jitterbug, the oldest phone Plaintiff knows she used is the Samsung Galaxy A01[4] and we have produced data from the time period that device was in use. We explored whether it is possible to use the disclosed devices (which are in her possession) to obtain any data that predates their use and we explored if we could do so through Verizon, Google (which sometimes backs up Android devices), or the device manufacturers (Samsung and Motorola) on the off chance those sources carry older data. There are no Google backups which would contain data not already produced. **We learned from an ESI consultant that it is extremely unlikely that Verizon, Samsung, or Motorola would have any data from 2016–20 as a result of the way in which backup data works from a technical perspective (even if whatever device(s) Plaintiff used in that period were to have been backed up to those services)**. We were told that the possibility cannot be 100% foreclosed, but that we should not expect to be able to recover any data and the cost to try would very quickly balloon into the thousands of dollars. Based on this advice, we believe we have more than complied with our discovery obligations and any further search would be unreasonable and disproportionate to the needs of the case.

Ex. C. at 27-28; *see also id.* at 14.

---

[4] This changed when Plaintiff updated her device list again. See Ex. A at 5.

In general, Plaintiff's counsel claimed that she had gone to "frankly extraordinary lengths" to recover the missing texts.[5] Ex. C at 27. She also asserted that "Plaintiff has been **transparent** with Defendants regarding her efforts to obtain data from that period." (emphasis added). *Id.* at 14.

**October 15, 2026:** On this date, the parties participated in a status conference with the Court. At this time, State Defendants learned for the first time that the Jitterbug had been located and was actually in the custody of Plaintiff's attorney. This was news to State Defendants, because they had previously been under the impression that the Jitterbug had never been found. Plaintiff's attorney further shared that the texts on the Jitterbug supported the most recent range of that phone's use – from 2014 to July 2016 – except for certain spam text messages postdating July 2016. The Court ordered counsel to meet and confer in order to reach further resolution.

**October 21, 2026:** When conferring with counsel for Plaintiff pursuant to the Court's directive, State Defendants learned for the first time that the Jitterbug was apparently identified and "searched" *before* Plaintiff's deposition ever took place, and apparently did not contain any responsive information. Plaintiff's counsel refused to disclose when this search occurred, how it was conducted, or who conducted it. Plaintiff's counsel also explained that there now appeared to be text messages into 2017 on the Jitterbug. Plaintiff's counsel stated that the Jitterbug was being forensically imaged, but that only responsive text messages would be produced.

Undersigned counsel requested that either all the messages be produced or the Jitterbug itself be provided, so that undersigned counsel could have some context for the use of the phone given Plaintiff's testimony and the shifting dates of use, but Plaintiff's counsel refused. Undersigned counsel also informed Plaintiff that Ms. Boardman still had not provided the missing

---

[5] Of course, before this dispute ever came to light, there was the theoretical possibility of obtaining the texts from Paul Zent. By the time the Complaint was filed in February of 2025, it had been nearly two years since Paul Zent was terminated by OTAG. As such, OTAG could not be said to be in "possession, custody, or control" of their terminated employee's personal device.

Nevertheless, despite their lack of obligation to do so, as soon as State Defendants made contact with Zent, they asked him to search his phone for these messages. He explained that he had obtained a new phone two years prior, turned his old phone into AT&T, and was thus unable to search it. He did search his current device, and found no text messages whatsoever with Plaintiff.

messages, and asked for Plaintiff to produce *all* messages between herself and Ms. Boardman. Plaintiff's counsel refused.

**October 27, 2026**: **Ms. Boardman Responds.** While the disputes with Plaintiff's counsel were occurring, the undersigned made multiple attempts to follow up with Ms. Boardman to obtain the long-overdue messages. In Boardman's last email to State Defendants several weeks before, Boardman had stated, "I am still trying to find anymore documentation between myself and Katie Schmitz, but I had not saved much of our Facebook correspondence, as I had no idea it would ever be necessary to save." Ex. D, Boardman Email to Kellington. This was frankly not credible because Boardman *had literally read from the Facebook correspondence* at her deposition.

On October 27, undersigned counsel made their fifth attempt to follow up with Mary Boardman to obtain the long-overdue messages. Fortunately, Ms. Boardman responded, finally providing text messages and Facebook messages between herself and Plaintiff. Many of these messages were irrelevant to the case; several were not. In particular, one of the texts was sent by Plaintiff to Boardman at 5:43 pm on the evening of Boardman's deposition:




Ex. E., New Boardman Documents, at 6. This text had never been produced by Plaintiff.

Boardman also provided a chain of Facebook messages containing three separate conversations between Boardman and Plaintiff over a period of two months in 2024. These conversations concerned the status of Plaintiff's future lawsuit, her feelings about State Defendant Steve Herda, and her opinions of other OTAG leadership. *See, e.g.*, Ex. E, new Boardman Documents at 1-3. These conversations, too, had never been produced by Plaintiff, even though

Plaintiff previously provided *other* Facebook messages between herself and Mary Boardman from earlier time periods.[6]

**November 2, 2026**. On November 2, Plaintiff served another interrogatory supplement, providing a *third* device list in response to Interrogatory No. 2, and additional information for other interrogatories. *See* Ex. A, Interrogatory Response Excerpt, at 4-6, 7-9, 11-12; *see also* Ex. B., Device List Comparison Chart.

State Defendants will not reproduce the new information in full, but will note the more striking changes, starting with the Jitterbug. To recap, the Jitterbug was originally assigned the dates of 2016–2018 and then revised to 2014–July 2016. In the newest version, the Jitterbug is assigned the dates of December 2015 to July 2017. Oddly, however, Plaintiff cites the discovery of a new phone provider – "GreatCall" – who was supposedly billing Plaintiff through August of 2018. She writes that "she *believes* her teenage daughter used the phone for a period of time after July 2017 until June 2018, after which time the phone contains no further records or indications of use." (emphasis added). Ex. A at 6. She writes that she tried to review her bank records "to ascertain more specific use dates," but states that her bank records "dated only to 2025." *Id.*

Further, Plaintiff for the first time disclosed the existence of two Samsung accounts which are linked to two separate Google accounts. Ex. A at 9. None of these four accounts had been referenced in earlier interrogatory responses. Plaintiff also stated these four accounts were searched for backups. Ex. A at 12. It is not clear who conducted this search, or when the search occurred; the phrasing of the responses suggests that it was somewhat recently.

The existence of these accounts is difficult to reconcile with Plaintiff's earlier representations regarding her attempts to access data from 2016-2020, when she claimed that an ESI expert informed her of the high cost and likely futility of such a forensic retrieval effort. *Supra*

---

[6] Also notable was that this last chain of Facebook messages was produced by Boardman in Word document format, not as screenshots. Given obvious missing portions of the messages and inconsistencies with another set of partially overlapping screenshots produced by Boardman, State Defendants suspect that the messages may not be entirely complete.

at 7. It is not clear why a forensic retrieval effort would have been needed when Plaintiff had the account information and could simply log in and check for a backup, as she apparently finally did.

Next, Plaintiff disclosed a *new* Samsung smartphone, a "Galaxy J7," which was apparently used from December 2019 until November 2020. Ex. A at 5. She indicates that an "unknown Samsung smartphone" was used immediately prior this. *Id.* She bases this latest round of changes on "registration and login" emails which were apparently recently located in the newly-disclosed Google accounts. *Id.* at 5-6. As to the question of whether Plaintiff "has access to the contents of the phone" regarding the Galaxy J7 and the "unknown Samsung Smartphone," Plaintiff writes that they "are not in Plaintiff's possession, and their location or continued existence is unknown to her." *Id.* at 5.

Plaintiff also, for the first time, provides an answer to Interrogatory No. 6, regarding steps to preserve ESI, scope of preservation, deletions or losses, and restoration efforts. Here, Plaintiff states that she "affirmatively disclaims that she has engaged in, or permitted, 'any deletions or losses.'" *Id.* at 11-12. Apparently in an attempt to show she attempted to recover her device history, she states she looked at her Verizon account, but it only contained billing history from 2025, and her Best Buy account only contained five years of purchase history. *Id.*

## LAW AND ARGUMENT

### I. Good Cause Justifies Modification of the Scheduling Order.

State Defendants are mindful that the discovery motions deadline has passed in this matter. The discovery deadline elapsed on August 21, 2026, after an extension sought by Plaintiff moved it from July 1, 2026. Doc. No. 37. However, no party sought a concurrent extension of the discovery motions deadline, which therefore elapsed on July 1, 2026. Doc. No. 27.

As such, State Defendants respectfully request that the scheduling order be modified under Rule 16(b) for the limited purpose of resolving the issues set forth in this motion. "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 717 (8th Cir. 2008). Here, State Defendants have established such good cause. Until Plaintiff's deposition on July 27, 2026, State Defendants had

no inkling that the information provided thus far by Plaintiff was incorrect, and even after that date, the existence of an older phone was no indication of the wholesale revision of Plaintiff's discovery responses relating to ESI which have since occurred. State Defendants also had no way of knowing that Plaintiff had failed to provide all responsive documents. Nevertheless, State Defendants have been working diligently for months to obtain answers to all of their questions. *See generally* Ex. C., Correspondence. Therefore, State Defendants ask that the Court amend the scheduling order for the limited purpose of the instant motion.

## II. State Defendants Are Entitled to Relief Under Rule 37(a), Rule 26(g), or Both.

At this point, State Defendants face two problems in their efforts to defend this litigation. First of all, there is the facial inadequacy of Plaintiff's responses to State Defendants' interrogatories. Second, there is the demonstrated inadequacy of Plaintiff's discovery responses *in general,* demonstrated by Plaintiff's failure to adequately search for relevant documents as evidenced from her interrogatories, her counsel's position that supplementation requires data collection and is only required "after a particularly long pre-trial delay," *and*, Plaintiff's proven failure to produce responsive information that was independently produced by another witness.

These problems are magnified by Plaintiff's continued refusal to give information. With limited exceptions, State Defendants simply do not know what they do not know. Contrary to the "spirit and purpose" of the federal rules, Plaintiff is keeping State Defendants "in the dark" in their efforts to litigate this matter. *Beaulieu v. Stockwell*, No. CV 16-3586 (DWF/HB), 2019 WL 3947007, at *3 (D. Minn. Aug. 21, 2019), citing *Hickman v. Taylor*, 329 U.S. 495, 500-01 (1947.) In this unusual situation, Rule 37(a) and, alternatively, Rule 26(g) justify the relief requested here.

### A. A Motion to Compel Under Rule 37(a) Is the Appropriate Remedy Where Plaintiff's Answers Are Both Evasive and Incomplete.

Before even turning to the standard analysis for a motion to compel, described below at II.B, a threshold question is whether it makes sense to compel discovery when, according to Plaintiff, she has already provided it. The answer lies in Rule 37.

Under Rule 37(a)(3)(B)(iii) and (iv), a party may move to compel an answer to an

interrogatory submitted under Rule 33 or to produce documents as requested under Rule 34. Relevant here, "*an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond*." Fed. R. Civ. P. 37(a)(4). *Pyle v. A.H. Bennett Co.*, 699 F. Supp. 3d 795, 804 (D.N.D. 2023) (internal citations omitted).

Here, Plaintiff's answers are both evasive and incomplete. Starting with the interrogatories, Plaintiff has repeatedly made what appear to be halfhearted and evolving attempts to answer; she now claims, despite the discovery of new phones and accounts, to be unable to proceed any farther. This does not suffice. In answering interrogatories, a party is obligated to respond with available information that "can be produced without undue labor and expense." *Murphy by Murphy v. Piper*, No. CV 16-2623 (DWF/BRT), 2018 WL 2278107, at *4 (D. Minn. May 18, 2018). "The answering party cannot limit his answers to matters within his own knowledge and ignore information immediately available to him or under his control." *Id.* Yet that is exactly what Plaintiff is doing. For instance, in Interrogatory 2, Plaintiff has *still* not provided a full account of devices used since 2016. It is not enough for Plaintiff to merely point to the fact that only 24 months of bills are available through Verizon's account page. Verizon's public-facing website clearly indicates that older bills are available through their Customer Service portal. *See* https://www.verizon.com/support/mobile-bill-updates/ ("Beyond 24 months, contact us. On the Contact us page, choose Chat with us for the quickest option.") Nothing in Plaintiff's response indicates that she has even gone to the minimal effort of contacting customer service to figure out her device history.[7] As to the two oldest smartphones, Plaintiff's claim that they "are not in Plaintiff's possession, and their location or continued existence is unknown to her" is so vague as to be nonresponsive. What happened to these phones? Were they traded in, or broken?

Plaintiff's response to Interrogatory No. 6 is similarly nonresponsive. Plaintiff disclaims any "deletions or losses," but even assuming arguendo that Plaintiff has deleted nothing, this

[7] State Defendants asked directly if Plaintiff would be willing to obtain these records, but were rebuffed by Plaintiff's counsel. *See* Correspondence at 1. Plaintiff's counsel went on to describe the request as a product of the undersigned's "illogical anger." *Id.*

statement is impossible to reconcile with the literal loss of the text messages and devices which triggered this dispute in the first place.

Lastly, all of Plaintiff's interrogatory responses contain multiple objections. Her "discovery on discovery" objections are not meritorious as set forth below, and it is unclear how her work product or attorney-client privilege objections could have merit, because those doctrines do not protect descriptive *facts* such as the location of a particular phone.

In addition to these flaws in her interrogatory responses, Plaintiff's document production *in general* now appears to be evasive and incomplete. Plaintiff's failure to independently produce the messages recently supplied by Ms. Boardman calls her entire document production into question. Recall, when undersigned counsel requested messages between Plaintiff and Boardman, the request was vehemently denied. Ex. A. at 28. Yet when the messages finally arrived from Ms. Boardman, they contained documents which Plaintiff herself should have already produced. Clearly, whatever search Plaintiff performed (the details of which, again, have not been shared) failed to capture all responsive information, and Plaintiff is similarly failing to supplement her responses as required. And given Plaintiff's counsel's extraordinary statement that producing supplemental responses "requires" a phone to be collected which itself can only happen in the certain undefined circumstances such as an "unusually long pretrial delay," Plaintiff has essentially admitted that she is failing to comply with her duty to supplement. Ex. A. at 19.

In short, Plaintiff's responses to both Interrogatories 2 and 6, and her document production at least as far as responsive communications relating to the subject matter of the case are concerned, are incomplete and therefore properly treated as a failure to answer, which can be remedied by a Rule 37 motion to compel.

**B. State Defendants Can Meet Their Threshold Showing of Relevance To Justify a Motion to Compel.**

Rule 26(b)(1) defines the scope of permissible discovery in a civil case. *See generally* Fed. R. Civ. P. 26(b)(1). "The scope of discovery under Rule 26(b) is extremely broad." *Eberline Oilfield Serv., Inc. v. Chad Eberline & All in One Oil Field Serv., Inc.*, No. 1:18-CV-245, 2023

WL 157404, at *2 (D.N.D. Jan. 11, 2023) (internal citations omitted).

When making a motion to compel under Rule 37(a), the moving party must make "a threshold showing of relevance," and then the opposing party "has the burden of showing its objections are valid by providing specific explanations or factual support as to how each discovery request is improper." *Id.* at 3. The *Eberline* court further detailed the showing to be made by the opposing party and the standard of relevance:

> The party must demonstrate that the requested documents either do not come within the broad scope of relevance defined pursuant to Rule 26(b)(1) or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosures." Id. (quoted case omitted). Relevancy in this context "has been construed broadly to encompass **any matter that bears on, or that reasonably could lead to another matter that could bear on, any issue that is or may be in the case.**

*Id.* at 3. Here, the showing of relevance is easily made. The contested interrogatories are all reasonably directed at assuring that Plaintiff *actually produces* the evidence directly bearing on the issues in this case. Again, this case is based entirely on allegations of conduct brought by Plaintiff, the majority of which were never disclosed to State Defendant OTAG until after she resigned. As such, her own documents and communications describing her subjective experience at OTAG are presumably the *only* evidence of many of her allegations. The evidence produced thus far by Plaintiff indicates many inconsistences between what she alleges now and what she actually communicated at the time.[8] Exploring the truth of Plaintiff's allegations is obviously something that State Defendants are entitled to do.

---

[8] For instance, the only text message produced between Plaintiff and Paul Zent is dated from May of 2021 and reads as follows:

Plaintiff: Sorry I exploded on you Paul. Thanks for taking it so well. You're a good man.

Zent: No need to apoligze [sic]. If you needed someone to take it out on, I'm glad it was me. No matter what you say or what you do will make me think less of you. You are tops in my book. Friends sometimes need to share with each other, and I hope you are still my friend, because I consider myself your friend. Have a good weekend.

SCHIMETZ0001741, SCHIMETZ0001743

To the extent such explorations constitute "discovery on discovery," such inquiries are clearly justified in the unusual circumstances of the instant case. In the words of a recent district court case from South Dakota:

> The Eighth Circuit has not addressed this issue, but courts within the circuit do not take such inquiries lightly. *See In re Whatley v. Canadian Pac. Ry. Ltd.*, 2021 WL 1951003, at *10 (D.N.D. May 14, 2021). But, while discovery on discovery is disfavored, courts recognize that it can be obtained if a party "provide[s] an **adequate factual basis to justify the discovery**[.]"

*Buergofol GmbH v. Omega Liner Co., Inc.*, No. 4:22-CV-04112-KES, 2024 WL 4291467, at *7 (D.S.D. Sept. 25, 2024) (internal citations omitted). Here, an "adequate factual basis" exists because Plaintiff's discovery compliance has not only been "drawn into question," but has been dispositively shown to be inadequate from all angles, including her implausibly shifting list of devices, her proven failure to produce responsive documents available from other witnesses, and her counsel's claim restrictive view of the duty to supplement.

**C. In the Alternative, Relief is Also Available Under Rule 26(g).**

An interesting case from the Northern District of Illinois confronted similar issues as those present here and concluded that "discovery on discovery" was best understood as sanction under Rule 26(g). In *LKQ Corp. v. Kia Motors Am., Inc.*, the court reviewed the legal landscape regarding discovery on discovery and sought to identify the particular Rule providing for such a right. *LKQ Corp.*, 345 F.R.D. 152, 157-163 (N.D. Ill. 2023). Determining that Rule 26(b)(1) did not apply because discovery under that Rule concerned substance, not process, the court then considered Rule 37. *Id.* It rejected that rule too, observing, "Rule 37 deals with the *consequences* of a failure to preserve and/or disclose, and does not necessarily address a party's *initial* concern that an opponent's discovery production process was inadequate." *Id.* at 159. Eventually, the court concluded that Rule 26(g) was the source of authority for discovery on discovery. *Id.* at 159-161. It explained that that "Rule 26(g) requires counsel and the client to make a reasonable inquiry in responding to discovery, and by signing the response to a document request has certified as much. Courts and parties **rely on these certifications and properly conclude that the reasonable**

**inquiry standard has been met when they see such a signature**." *Id.* at 161 (emphasis added). The court therefore reasoned that:

> Thus, according to Rule 26(g), if a court finds that a **reasonable effort** has not been made to provide responsive information, despite the attorney's Rule 26(g) certification requirement, the court must impose a sanction, but has authority to craft a sanction that fits the needs of the case. In that situation, a court may order additional discovery to get to the bottom of **whether additional responsive documents were not produced because of a failure to conduct a reasonable inquiry in the initial production process**. This could include interrogatories, requests to admit, or depositions about the document collection, review, and production process **to determine the extent of any alleged discovery failures**.

*LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 160 (N.D. Ill. 2023) (emphasis added)

This is exactly the situation present here – State Defendants have been relying on Plaintiff's Rule 26(g) certifications, which have been demonstrably incorrect. For instance, it is simply not possible that Plaintiff could have made a "**reasonable inquiry**" in her first or even second attempt to respond to Interrogatory No. 2, considering the revisions to her device list, and she clearly is not making a reasonable effort now when she declines to even request her Verizon bills. The outstanding question here is likewise "whether additional responsive documents were not produced." *Id.* As such, State Defendants are entitled to discovery on discovery "to determine the extent of any alleged discovery failures." *Id.*

It is also to point out that State Defendants do not take the position that an intrusive inquiry into Plaintiff's ESI search techniques would have been justified at the outset of this case. As set forth in the Sedona Principles, State Defendants generally agree that the responding party is in the best position to produce its ESI, barring any "specific, tangible, evidence-based indicia" of a "material failure by the responding party to meet its obligations." *LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 160 (N.D. Ill. 2023) (citing 19 Sedona Conf. J. at 123). Such indicia now exist. Further, State Defendants have attempted to be very reasonable in asking that discovery deficiencies be remedied. They are not demanding perfection, just a reasonable inquiry. But at this point, Plaintiff's failure to comply with her discovery obligations is clear from the facial inadequacy of her interrogatory responses, the inconsistency of those responses, her counsel's

position on supplementation, the newly-produced documents from Boardman which Plaintiff failed to produce herself, and Plaintiff's continued resistance to supplying missing information.

**D. Appropriate Relief**.

Whether this Court grants relief as a motion to compel under Rule 37(a) or as a sanction under Rule 26(g), State Defendants suggest that an order compelling the following information, items, and and documents would permit State Defendants to evaluate whether Plaintiff has complied with her Rule 26(g) obligations, or, whether further searches or spoliation sanctions are necessary. State Defendants have attempted to request the minimum amount of information necessary to resolve this matter, but State Defendants welcome the Court's direction as to any more efficient paths forward.

State Defendants note that the requirements for a forensic analysis of Plaintiff's devices appear to be met. *See Peterson v. City of Minot*, No. 1:16-CV-271, 2018 WL 5045194, at *6 (D.N.D. Oct. 17, 2018) ("A party seeking a forensic examination (1) offer something more than suspicion that the device contains material that is relevant, and (2) that the forensic examination is proportional to the needs of the case in light of the factors set forth in Fed. R. Civ. P. 26(b)(1), including the additional costs and burdens imposed by such an examination."). *See also Deluxe Fin. Servs., LLC v. Shaw*, No. 16-CV-3065 (JRT/HB), 2017 WL 10505352, at *2 (D. Minn. Feb. 9, 2017) (summarizing cases where forensic examinations are granted even in the absence of evidence of discovery misconduct or shortcomings.) But to minimize burden, at this time, State Defendants do not seek such relief except for Plaintiff's Jitterbug, which presumably is not actively used such that its absence would prove only minimally inconvenient. State Defendants propose an order compelling Plaintiff to do the following:

**1. Fully Answer Interrogatories 2, 3, and 6, without objection**

Specifically, Plaintiff must dispense with her objections and make a good-faith answer to obtain information that would fully answer these interrogatories.

**2. Answer the Following Supplemental Interrogatory Regarding ESI Searches Conducted by Plaintiff or Her Agents**:

State Defendants request that the Court order Plaintiff to answer the following supplemental interrogatory:

> For every search, (including but not limited to the collection of Plaintiff's phone, and the searches of her Google and Samsung accounts mentioned in the Third Supplement, the pre-deposition search of the Jitterbug, and any of Plaintiff's own searches of her own accounts and/or devices), explain in detail (1) which accounts and/or devices were collected and/or searched; (2) who performed the acquisition and/or search; (3) the dates of all searches and techniques used; (4) search terms used, if any, and (5) the data categories and time periods captured.

**3. Supplemental Productions of Documents.**

State Defendants request that the Court order Plaintiff to produce the following, with any privileged information logged on a privilege log:

**a.** Documents sufficient to describe the searches listed in the Supplemental Interrogatory, including all communications with ESI vendors, search protocols used, and any further documents reflecting searches for responsive information in this litigation;

**b.** Native versions of all communications with Mary Boardman from 2016 until the present;

**c.** Jitterbug Phone (by mail to the undersigned, at State Defendants' expense)

**d.** All Verizon bills dating back to 2016 and any documentation of devices available from Verizon;

**e.** All communications referenced in the Nov. 2 supplemental interrogatory response, including native versions of emails and Facebook messages;

**4. Supplemental Search of Facebook information**

State Defendants request that the Court order Plaintiff's counsel to download and search Plaintiff's Facebook data directly from Meta itself, using the directions available at "Export a copy of your Facebook information," https://www.facebook.com/help/212802592074644, and produce all responsive messages (and describing the search in the above Supplemental Interrogatory).

**5. Any Other Relief Suggested by the Court**.

Lastly, State Defendants request that the Court fashion its own relief, if it sees fit, in order to more efficiently resolve this matter.

Dated this 6th day of November, 2026.

State of North Dakota
Drew H. Wrigley
Attorney General

By: /s/ Jane G. Sportiello

Jane G. Sportiello
Assistant Attorney General
State Bar ID No. 08900
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email jsportiello@nd.gov

Attorneys for Defendants North Dakota Office of the Adjutant General and Stephen P. Herda.